UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| v. | ) |
| | ) CR. NO. 04-10046-RGS |
| **JOSE GONZALEZ, AKA "KING** | ) |
| **STRIKE", AKA "TITO",** | ) |
| Defendant. | ) |

## SENTENCING MEMORANDUM OF THE UNITED STATES

On April 12, 2005, the defendant, **Jose Gonzalez**, pled guilty to one count of conspiracy to distribute more than five grams of cocaine base, also known as "crack cocaine", in violation of 21 U.S.C. § 846, and three counts of distributing more than five grams of cocaine base, also known as "crack cocaine", in violation of 21 U.S.C. § 841(a)(1). Sentencing is scheduled for April 21, 2005. This memorandum is submitted to assist the Court in sentencing the defendant.

The Presentence Report prepared by the U.S. Probation Office, dated April 5, 2005 (the "PSR"), concluded that the defendant's Guideline Sentencing Range ("GSR") is 63-78 months (with a 5-year mandatory minimum), based on a Total Offense Level of 25 and a Criminal History Category of II. PSR ¶¶ 109-110. The government requests that the Court sentence the defendant to a term of imprisonment at the high end of the GSR -- i.e., 78 months. The government requests a sentence at the high end of the GSR because of the significant evidence in this case that the defendant was a major crack cocaine dealer in Lawrence, including

the defendant's own statement, on audio and videotape, that he cooks 200 grams of crack cocaine a week.

## I. BACKGROUND OF THE INVESTIGATION

In 2002, the Federal Bureau of Investigation ("the FBI") commenced an investigation into drug trafficking and other suspected criminal behavior in the Lawrence and Lowell, Massachusetts area by members and associates of the Almighty Latin King Nation ("Latin Kings"). Over the course of the investigation, cooperating witnesses ("CW's") working for the FBI made approximately 30 purchases of heroin, cocaine and cocaine base from members and associates of the Latin Kings.

All of the drug purchases were made in the Lawrence/Lowell. All of the purchases (and most of the conversations and negotiations leading up to the purchases) were consensually recorded. Most of the deals also took place in a car equipped with audio and video equipment. The CW's also wore transmitters during most of the purchases. The transmitters enabled law enforcement agents to listen to conversations as they took place.

The investigation also disclosed substantial amounts of information regarding the organization and structure of the Latin Kings. The Massachusetts Chapter of the Latin Kings is a street gang with hundreds of members in Lawrence, Lowell and other cities. The Latin Kings operate local chapters throughout the state including chapters inside many correctional facilities.

Many members of the gang are involved in a broad range of illegal activities including drug trafficking and crimes of violence undertaken in furtherance of protecting the interests of the gang and its members. More information regarding the Latin Kings is set forth in the detention affidavit which was filed in this case on February 24, 2004. See DKT. #15.

The present indictment resulted from one aspect of this investigation: the distribution of crack cocaine and cocaine by **Angel Gonzalez, a/k/a "King A-Shot"**, and/or **Jose Gonzalez, a/k/a "King Strike", a/k/a "Tito".** The sales were surveilled by law enforcement agents and recorded on audio and/or video tape.

**II. THE TRANSACTIONS INCLUDED IN THE INDICTMENT**

    **A.    Count 2: the 9/12/03 sale of 14.4 grams of cocaine by Angel Gonzalez**[1]

On September 12, 2003, a cooperating witness working with the FBI (the "CW"), met with agents and called **Angel Gonzalez** and they had a consensually recorded call in which the CW said that he/she was selling cocaine and **Angel Gonzalez** said he also sold cocaine and could get a good price for the CW from his cocaine connection. **Angel Gonzalez** told the CW he could get him/her 14 grams of cocaine for $500 and told the CW to pick him up at 78 Inman Street in Lawrence. A few minutes later, **Angel Gonzalez**

---

[1] **Jose Gonzalez** is not charged in Count Two of the Indictment.

3

called back and said that his connect did not want to meet anyone. The CW said he/she would give **Angel Gonzalez** the money and let **King A-Shot** conduct the transaction himself.

That afternoon, agents provided the CW with a body recorder and transmitter, $500 in official government currency ("OGC"), and a car equipped with audio/video surveillance equipment, and told the CW to meet **Angel Gonzalez**. Under surveillance, the CW drove to 78 Inman Street in Lawrence where he/she picked up **Angel Gonzalez**. Agents then followed the CW and **King A-Shot** to 28A Railroad Street in Methuen. The CW gave **Angel Gonzalez** the $500 in OGC and **King A-Shot** went into the rear building at 28 A Railroad Street. **Angel Gonzalez** returned to the car moments later and handed the CW a plastic bag containing the cocaine. They then drove back to 78 Inman Street where the CW dropped off **Angel Gonzalez**. DEA NERL certified that the substance **Angel Gonzalez** sold the CW was 14.4 grams of cocaine.

The car ride to and from Methuen was video and audio taped from the inside of the car. During the ride to pick up the cocaine, **Angel Gonzalez** can be seen and heard telling the CW that he can get him/her "anything you need" (referring to drugs). In addition, **Angel Gonzalez** can be seen and heard telling the CW a story about a man who had been telling people that **Angel Gonzalez** ripped him off for $200. Referring to this individual, **Angel**

**Gonzalez** stated: "I got my burner" (i.e., his gun) and went over to his house "and I was gonna fix this shit" and I knocked on the door and someone looked out the window but no one opened the door "but I'm telling you right now anything would have come out of his mouth I would have put a hole in his mouth."

During the car ride back to **Angel Gonzalez's** house, after they got the cocaine, the CW asked whether the same supplier who got **Angel Gonzalez** the cocaine could get crack and **Angel Gonzalez** can be seen and heard on tape saying no but that he has another supplier from whom he can crack for the CW and stating "my other connect can cook it, my boy can cook it."

    B.    <u>Count 3: the 9/16/03 sale of 12.1 grams of crack cocaine by Angel Gonzalez and Jose Gonzalez</u>

On September 16, 2003, agents provided the CW with a body recorder and transmitter, $600 in OGC, and a car equipped with audio/video surveillance equipment, and the CW went to meet **Angel Gonzalez** to buy crack cocaine. The CW went to **Angel Gonzalez's** residence at 78 Inman Street in Lawrence and met with **Angel Gonzalez** asked for 14 grams of crack cocaine.[2] **Angel Gonzalez** said that his crack cocaine contact was unavailable and that he

---

[2] 78 Inman Street is listed as **ANGEL GONZALEZ'S** address on his criminal history record. Electricity records for 78 Inman Street indicated that the subscriber has been **DESI GONZALEZ** since 9/15/03. **DESI GONZALEZ** is the brother of **ANGEL GONZALEZ** and, according to prison records, was a regular visitor to **ANGEL GONZALEZ'S** in prison.

was waiting for his "material" to arrive.

The CW and **Angel Gonzalez's** got into the CW's car and **Angel Gonzalez's** stated that they could get crack from "**Tito**" (**a/k/a King Strike, a/k/a Jose Gonzalez**). The CW and **Angel Gonzalez** drove to 286/288 Farnham Street in Lawrence, **Jose Gonzalez's** apartment. **Angel Gonzalez** went into the building and came back a short time later and said that **Strike** (i.e., **Jose Gonzalez**) was going to get the cocaine and "chef" it (i.e., cook the cocaine into crack), but that it would probably cost $600 not $500, and that **Jose Gonzalez** would "chef" it for $40. **Angel Gonzalez** and the CW then left and got some beer.

A short time later, the CW and **Angel Gonzalez** returned to 286/288 Farnham Street and, when they arrived, the CW can be seen on the video handing **Angel Gonzalez** the OGC. **Angel Gonzalez** went into the building and returned a few minutes later with **Jose Gonzalez** and they both got in the car (**Angel Gonzalez** in the front and **Jose Gonzalez** in the back). **Angel Gonzalez** can be heard on the audio tape telling the CW that **Jose Gonzalez** is "gonna get fuckin' a fourteen of powder and he's gonna chef it for you . . ." **Angel Gonzalez** told the CW to drive to Cross Street. On the way, **Angel Gonzalez** handed the OGC to **Jose Gonzalez.**

6

During the drive, **Jose Gonzalez** and the CW can be seen and heard talking about **Jose Gonzalez's** crack cocaine trafficking. **Jose Gonzalez** explained to the CW the benefits of buying cocaine in powder form and then cooking it (as opposed to simply buying the crack), and encouraged the CW to "always" buy drugs from him as he will give him/her the best price and lead to better profits for the CW. **Jose Gonzalez** can then be seen and heard telling the CW that he was cooking "200 grams" of crack cocaine a week and that he "hustled" a number of different drugs as a middle man. When they got to Cross Street, **Jose Gonzalez** made a call on his cell phone and then told the CW to drive to Auburn Street.

When they got to Auburn Street (under continued surveillance), **Jose Gonzalez** got out of the car and met with an unidentified male, whom **Jose Gonzalez** introduced as "TONY". TONY got into the car and **Jose Gonzalez** gave TONY the $600 in OGC that the CW had given to **Angel Gonzalez**. The CW was directed to a house on Center Street in Methuen. TONY went into the house. While they waited, the CW, **Jose Gonzalez**, and **Angel Gonzalez** continued to talk about the quality and cost of the drugs the CW was buying. TONY came out moments later, and got into the car and handed **Jose Gonzalez** a clear plastic bag containing cocaine. **Jose Gonzalez** then handed the bag along with $80 in change to CW. The CW then held up the bag of cocaine and "inspected" it, including smelling it. The CW stated: "that don't smell like the

last one . . . I like the way the last one smelled." **Jose Gonzalez** then stated that they would have to go to his house to cook the cocaine.

While driving back to **Jose Gonzalez's** apartment, the CW stopped so that **Jose Gonzalez** could buy some ice he needed to cook the powder cocaine into crack. The three of them went back to **Jose Gonzalez's** apartment, and, when they arrived, **Jose Gonzalez** can be heard on tape introducing the CW to his wife and children. **Jose Gonzalez** cooked the powder cocaine into crack and provided the crack to the CW in a clear plastic bag. **Jose Gonzalez** can be heard on tape telling the CW: "You can take it wet like this right. But once you get to the wherever your going to go let it out to dry with the air okay?" "Just let it dry by itself with the air, you know what I mean or you can sit there with the fan you know what I mean?" During the cooking, **Angel Gonzalez** could be heard telling the CW: "He's just drying it up and breaking it down."

The CW gave **Jose Gonzalez** $40.00 for cooking the crack and then left the apartment. DEA NERL certified, and agents would testify, that the substance was 12.1 grams of crack cocaine.

### C. Count 4: the 10/21/03 sale of 7.9 grams of crack cocaine by Jose Gonzalez

On October 20, 2003, agents met with the CW and provided the CW with $600 in OGC, a transmitter and recorder, and the CW went to **Jose Gonzalez's** residence, 286/288 Farnham Street, Apt. 2, in Lawrence, to buy 14 grams of crack cocaine. The CW met with **Jose Gonzalez** in his apartment and asked for 14 grams of crack cocaine. **Jose Gonzalez** told the CW that he could provide the crack cocaine the following day at about 4 p.m.

On October 21, 2003, agents provided the CW with $600 in OGC, a transmitter and recorder, and the CW went to 286/288 Farnham Street, Apt. 2, where the CW met with **Jose Gonzalez** in his apartment. **Jose Gonzalez** showed the CW a table in a room adjacent to the kitchen that contained approximately 3 ounces of cocaine and packaging material. There were several people in the room whom the CW did not recognize who appeared to be involved in packaging the cocaine. **Jose Gonzalez** told the CW that the cost of the crack cocaine would be $450. The CW gave **Jose Gonzalez** $500 in OGC ($450 for the cocaine and $50 as a fee for cooking it). The CW told **Jose Gonzalez** that he/she would run some errands while he cooked the crack and would return soon thereafter. The CW left and met with agents.

Later that day the CW returned to 268/288 Farnham Street, Apt. 2, and met with **Jose Gonzalez**. There conversation can be

heard on the audio tape.  The CW can be heard asking "alright what's the price?"  **Jose Gonzalez** can be heard responding:  "Tell me what you get it for; I'm going to make it less than that."  He continued: "I just finished cooking something" and then "I'm cooking the same thing for him" (referring to someone else for who he was cooking crack).  The CW can be heard saying that she wanted it "cooked".  **Jose Gonzalez** then said: "Talk to me honestly, what do you pay?"  The CW responded "five" and **Jose Gonzalez** said "I'm going to give it to you for $450.  You're coming to me so I'm going to give it to you for $450."  **Jose Gonzalez** then explained that because the CW was coming directly to him he was taking off the $50 cooking charge that the CW was charged on the previous buy, and can be heard encouraging the CW to continue coming directly to him, saying "keep coming to me, my shit is raw, raw, raw."  Later, **Jose Gonzalez** said "just take it because I want you to keep coming, you know what I mean?"

**Jose Gonzalez** brought the CW into the kitchen and handed the CW a plastic baggie containing the crack cocaine.  **Jose Gonzalez** then gave the CW his telephone number -- 978-397-5664 -- and told the CW to call him if the CW needed more crack cocaine.  Telephone number 978-397-5664 comes back to Althea Cormier, the girlfriend of **Jose Gonzalez.**

10

The CW left and met with agents and provided agents with the crack cocaine. DEA NERL certified, and agents would testify, that the baggie contained 7.9 of crack cocaine.

**D.  Count 5:  the 11/13/03 sale of 9.5 grams of crack cocaine by Jose Gonzalez**

On November 13, 2003, the CW made a consensually recorded call to **Jose Gonzalez** at 978-397-5664 to arrange to purchase 14 grams of crack cocaine. **Jose Gonzalez** said he was ready and gave the CW directions to his new residence at 231 Farnham Street, Second Floor, in Lawrence. Agents provided the CW with a recording device and transmitter, and $500 in OGC, and the went to 231 Farnham Street where the CW met with **Jose Gonzalez**.

**Jose Gonzalez** took the CW to a washing machine in his second floor apartment; the crack cocaine was laid out on top of the machine. The CW can be heard remarking that "it" is all "flat". The CW can then be heard telling **Jose Gonzalez** to "bag it up". **Jose Gonzalez** can be can be heard giving the CW his new home telephone number -- 978-258-9386 (subscriber records indicate the number is subscribed to Althea Cormier, **Jose Gonzalez's** girlfriend). Althea Cormier joined them and can be heard making small talk with the CW and STRIKE. The electricity at 231 Farnham Street comes back to Althea Cormier.

As the CW was leaving, **Jose Gonzalez** said "anytime you want to buy anything I'm just going to [unintelligible]" and then said

"a lot of people do that, for whatever I sell." The CW then said "they came out big" (referring to the crack) and **Jose Gonzalez** responded "nice too".

The CW left and met with agents and provided them with the crack cocaine. The DEA laboratory certified, and agents would testify, that the substance contained 9.5 grams of crack cocaine.

### III.  THE DEFENDANT SHOULD BE SENTENCED AT THE HIGH END OF THE GUIDELINE RANGE

The taperecorded conversations of the defendant show that he was a significant crack cocaine trafficker in Lawrence. The government, and the PSR, have taken a conservative approach in this case and have not sought to hold the defendant accountable for all of the crack cocaine that he discussed trafficking on tape. See U.S.S.G. §§ 1B1.3(a)(1)(A) & (a)(1)(B). See also PSR ¶ 45. This Court should, however, take the defendant's statements and conduct in evaluating where, within the sentencing guideline range, to sentence the defendant. Based on the defendant's statements and conduct, as described below, the Court should sentence him at the high end of that range.

The evidence shows that JOSE GONZALEZ made three controlled buys of crack cocaine to the CW. On each occasion, JOSE GONZALEZ was easily able to obtain the cocaine and cook it into crack cocaine. During the controlled buy of 12.1 grams of crack cocaine on September 16, 2003, JOSE GONZALEZ brought the CW to his apartment (286/288 Farnham Street in Lawrence) and then

cooked the crack cocaine in the kitchen while his wife and children are in the apartment (JOSE GONZALEZ can be heard on tape introducing the CW and ANGEL GONZALEZ to his wife and children). PSR ¶ 26. The open and notorious way that JOSE GONZALEZ cooks the crack cocaine in the presence of his wife and children supports the inference that this is a commonplace occurrence, thus corroborating his statement that he cooks 200 grams of crack cocaine a week.

During the controlled buy of 7.9 grams of crack cocaine on October 21, 2003, JOSE GONZALEZ again brought the CW to his apartment at 286/288 Farnham Street. While in the apartment, JOSE GONZALEZ showed the CW a table in a room adjacent to the kitchen that contained approximately 3 ounces of cocaine, packaging material, and there were several other people in the room who appeared to be involved in packaging the cocaine. PSR ¶ 28,

The CW and JOSE GONZALEZ can then be heard, on tape, having the following conversation. The CW can be heard asking JOSE GONZALEZ "but you got it already?" JOSE GONZALEZ responded: "yeah" and the CW said "alright what's the price?" JOSE GONZALEZ responded: "Tell me what you get it for; I'm going to make it less than that." JOSE GONZALEZ can then be heard saying "I just finished cooking something" and then "I'm cooking the same thing for him" (referring to someone else for whom he was cooking

crack). The CW can be heard saying that she wanted it "cooked". JOSE GONZALEZ then said: "Talk to me honestly, what do you pay?" The CW responded: "five" and JOSE GONZALEZ said "I'm going to give it to you for $450. You're coming to me so I'm going to give it to you for $450." JOSE GONZALEZ then explained that because the CW was coming directly to him he was taking off the $50 cooking charge that the CW was charged on the previous buy, and can be heard encouraging the CW to continue coming directly to him, saying "keep coming to me, my shit is raw, raw, raw." Later, JOSE GONZALEZ said "just take it because I want you to keep coming, you know what I mean?" PSR ¶ 31.

The buy on October 21, 2003, shows that JOSE GONZALEZ is in the business of selling large amounts of crack cocaine and corroborates his statement that he sells 200 grams a week. JOSE GONZALEZ has a crack cocaine business set up in his apartment and is aggressively courting the CW's business and undercutting her other "supplier" by $50 to ensure that she continues to buy drugs from JOSE GONZALEZ.

The controlled buy of 9.5 grams of crack cocaine on November 13, 2003, further demonstrates that JOSE GONZALEZ was a large scale crack cocaine dealer and corroborates his statement that he was cooking 200 grams of crack cocaine per week. JOSE GONZALEZ again had the CW come to his apartment (this time his new apartment at 231 Farnham Street, Second Floor, in Lawrence), and,

again, their conversation was captured on audiotape. JOSE GONZALEZ showed the CW the crack cocaine, which was laid out on top of a washing machine. The CW can be heard remarking that "it" is all "flat". The CW can then be heard telling JOSE GONZALEZ to "bag it up". As the CW is leaving, JOSE GONZALEZ said "anytime you want to buy anything I'm just going to [unintelligible]" and then said "a lot of people do that, for whatever I sell." The CW then said "they came out big" (referring to the crack) and JOSE GONZALEZ responded "nice too". PSR ¶ 34-35.

## CONCLUSION

For the foregoing reasons, the government requests that the Court sentence the defendant to a term of imprisonment of 78 months.

                              Respectfully submitted,

                              MICHAEL J. SULLIVAN
                              United States Attorney,

                    By:  /S/ PETER K. LEVITT
                         PETER K. LEVITT
                         Assistant U.S. Attorney
                         One Courthouse Way
                         Boston, MA 02210
                         (617)748-3355

April 19, 2005